IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| MATTHEW DUGGINS, *Plaintiff* | § § § § | |
| v. | § § § | Civil Action No. 15-CV-127<br>JURY DEMANDED |
| DEE KING TRUCKING, L.P., *Defendant* | § § § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Matthew Duggins files this Original Complaint against Defendant Dee King Trucking, L.P. ("Dee King" or "Defendant"), and would show as follows:

### A. Parties

1. Plaintiff MATTHEW DUGGINS ("Duggins" or "Plaintiff") is a male and brings this action individually. Plaintiff resides in Vernon County, Missouri.

2. Defendant DEE KING TRUCKING, L.P. is a Texas limited partnership and may be served through its registered agent for service of process, D.T. King, Jr., 17601 St. Francis, Amarillo, Texas 79108.

### B. Jurisdiction and Venue

3. This case is brought under the Surface Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C. § 31100 *et seq*.

4. This Court has jurisdiction over this matter according to 28 U.S.C. § 1331 and 49 U.S.C. § 31100 *et seq*.

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### C. Exhaustion of Administrative Remedies

6. On or about September 8, 2014, Plaintiff timely filed a Complaint against Defendant with the Occupational Safety and Health Administration ("OSHA").

7. This Court has jurisdiction because the Secretary of Labor did not issue a final decision within 210 days of the filing of Plaintiff's Complaint and Plaintiff's request to exercise the "kick-out" provision of the STAA was approved on April 7, 2015. *See* 49 U.S.C. § 31105(c) and Exhibit 1 attached hereto.

### D. Facts

8. On or about June 2, 2014, Duggins began working for Defendant as an over-the-road driver. Duggins's employment as an over-the-road driver required him to drive a self-propelled vehicle used on the highways in commerce principally to transport passengers or cargo. The vehicle driven by Duggins had a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds.

9. Immediately after Duggins began working, he started having safety concerns about the truck Defendant assigned him. Duggins's assigned truck exhibited high soot levels, it had a broken hood latch, and it had a loose and dim headlight. The truck frequently beeped continuously for fifteen (15) to thirty (30) minutes at a time. The beeping was loud and prevented Duggins from driving safely and from resting or sleeping on his mandated breaks.

10. Duggins immediately brought these safety concerns to Defendant's attention. Defendant instructed Duggins not to worry about it and to continue driving.

11. On or about June 6, 2014, Duggins contacted Defendant's dispatch office to notify them that his truck's weight was above Department of Transportation legal limits. Duggins said he did not want to drive illegally. Rather than address his concerns, Defendant instructed Duggins on which routes to take to avoid Department of Transportation weight scales.

12. On or about June 15, 2014, Duggins called Cindy Bertram ("Bertram") in Defendant's Human Resources department to report that his truck's weight was again above Department of Transportation legal limits.

13. Instead of addressing Duggins's safety concerns, Defendant began interfering with Duggins's ability to perform his job. Specifically, Duggins noticed that he was not receiving assigned loads for delivery, he was having problems with his fuel card, Defendant was giving him the wrong address for deliveries, and Defendant was giving him confusing and misleading instructions on load assignments. Duggins continued to voice his concerns about Defendant's unsafe operations and his safety concerns.

14. On or about June 19, 2014, Defendant's dispatch officer Shane Blackburn remotely logged into Duggins's in-truck hours log and manually changed the clock that recorded Duggins's hours of drive-time. Defendant changed some of the hours that Duggins had correctly, pursuant to Department of Transportation regulations, classified as on-duty non-driving time to off-duty non-driving time. Duggins did not give Defendant permission to change his hours log. This change had the effect of illegally and unsafely allowing Duggins to start driving again sooner than Department of Transportation regulations would allow.

15. On or about June 27, 2014, Defendant notified Duggins that he was filling out his hours report logs incorrectly. Specifically, Defendant informed Duggins that he should be counting certain hours as off-duty non-driving time, not on-duty non-driving time, so he could begin

driving sooner than Department of Transportation regulations permit. Defendant directed Duggins to fill out the records in a different way, which Defendant indicated was a legitimate way to fill out the report logs. Duggins questioned whether Defendant's method was appropriate under Department of Transportation regulations, because based on Duggins's training and experience, Defendant's method was illegal and unsafe.

16. On or about July 7, 2014, Duggins did not deliver a load on time because he did not have enough hours of drive time remaining under applicable Department of Transportation regulations. Duggins refused to violate Department of Transportation regulations by continuing to drive over the hours limit. He called Defendant's dispatch office to inform them that he would not be able to deliver the load. Duggins did not exceed the hours regulations, and he did not complete the assignment until he had sufficient time under the regulations to do so.

17. However, Defendant immediately retaliated against him for refusing to drive over the allowed work hours. Duggins's next load assignment was delayed and he was forced to wait for hours before he heard anything about the load's status from Defendant.

18. The next day, July 8, 2014, Duggins attempted to call Dee King, Defendant's president and CEO, to report the retaliation; his safety concerns; and violations of safety regulations. Duggins was not allowed to speak to Dee King and was instead transferred to Bertram. Duggins informed Bertram that he needed time off to speak to an attorney about the retaliation he was facing for making safety complaints. He told Bertram that the retaliation included a failure to be assigned loads, being assigned lower-paying loads, and being forced to wait for loads. He told Bertram that he was afraid to mention his safety concerns because he wanted to continue to work there. Bertram told him that he had "a chip on [his] shoulder" and a "persecution complex." Instead of being "upset" "off in a corner," Bertram recommended that Duggins have a "man to

man" conversation with Defendant's Vice President, Aaron King ("King"). Bertram also specifically informed Duggins that there was no problem with his driving because, if there were, she would have heard about it. Duggins reiterated his safety concerns and his complaint about being asked to "lie and cheat" on his time logs to evade Department of Transportation regulations regarding the reporting of on-duty hours. Although Duggins wished to make these complaints directly to Dee King, Bertram did not allow Duggins to do so.

19. Per Bertram's insistence, Duggins then called King about the retaliation; his safety concerns; and violations of safety regulations. Duggins informed King that he had been detained when attempting to deliver loads and therefore unable to deliver loads on time, which he believed to be retaliation for making safety complaints. Duggins further informed King that Defendant's employees had told him to run overweight loads, dodge Department of Transportation scales, drive unsafe equipment, and lie on logs to make things "easier" for himself. King told Duggins that he did not know what Duggins was talking about, did not "buy" Duggins's safety complaints, and ended the conversation by telling Duggins to call Bertram for further instruction.

20. When Duggins called Bertram immediately following his conversation with King, Bertram told Duggins to "bring the truck in" and that he had been terminated.

### E. Count – STAA Retaliation

21. Plaintiff incorporates by reference all of the allegations made above.

22. Plaintiff is an employee within the meaning of the STAA. Specifically, Plaintiff was employed by Defendant as a driver of a commercial motor vehicle, and Plaintiff directly affected commercial motor vehicle safety in the course of employment by a commercial motor carrier.

23. It is unlawful for an employer to discriminate or retaliate against an employee for engaging in STAA-protected activity. 49 U.S.C. § 31105(a)(1).

24. Specifically, it is unlawful for a person to discharge or discriminate against an employee regarding pay, terms, or privileges of employment because: (1) the employee has filed a complaint related to a violation of a commercial motor vehicle safety or security regulation or standard; or (2) the person perceives that the employee has filed or is about to file a complaint related to a violation of a commercial motor vehicle safety or security regulation or standard. 49 U.S.C. §31105(a)(1)(A)(i, ii).

25. As noted previously, Plaintiff complained to Defendant regarding his safety concerns and violations of safety regulations. Immediately thereafter, Plaintiff experienced fewer load assignments; lower-paying load assignments; delayed trips; problems with his fuel card; and/or confusing and misleading instructions on load assignments. Moreover, immediately after Plaintiff discussed his safety concerns and violation of safety regulations to Bertram and King, Plaintiff was terminated.

26. Moreover, Plaintiff engaged in STAA-protected activity by refusing to operate a vehicle on or about July 7, 2014 because the operation would have violated Department of Transportation regulations relating to driving hours on duty. 49 U.S.C. §31105(a)(1)(B)(i). Immediately thereafter, Plaintiff experienced a delay in workload assignment and termination.

27. Furthermore, Plaintiff also engaged in STAA-protected activity when he accurately reported hours on duty in his report log. 49 U.S.C. § 31105(a)(1)(C). Defendant retaliated against Plaintiff for accurately reporting his hours on duty. Because Plaintiff did so, Defendant gave Plaintiff fewer load assignments; lower-paying load assignments; often delayed his trips unnecessarily; and terminated Plaintiff.

28. As a result of Defendant's unlawful actions, Plaintiff has suffered substantial economic losses and severe mental anguish, and he will continue to suffer such losses in the future.

## F. Prayer for Relief

29. Plaintiff respectfully requests and demands judgment against Defendant for the following:

    (a)    Actual, consequential, and compensatory damages;

    (b)    Exemplary and punitive damages;

    (c)    Liquidated damages;

    (d)    Pre-judgment interest if, as, and when allowed by law;

    (e)    Reasonable and necessary attorney's fees;

    (f)    Costs of court;

    (g)    Post-judgment interest;

    (h)    Reinstatement; and/or

    (i)    Any other relief to which Plaintiff may be entitled, whether in law or equity.

## G. Jury Demand

30. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury on all issues.

Respectfully submitted,

/s/ Melissa Morales Fletcher
Melissa Morales Fletcher, *Of Counsel*
State Bar No. 24007702
THE MORALES FIRM, P.C.
115 E. Travis, Suite 1530
San Antonio, Texas 78205
Telephone: (210) 225-0811
Facsimile: (210) 225-0821
melissa@themoralesfirm.com


Phillip R. Russ
State Bar No. 17406000
2700 S. Western St. Suite 1200
Amarillo, Texas 79109
Telephone: (806) 358-9293
Facsimile: (806) 358-9296
philiprruss@russlawfirm.com

**Attorney for Plaintiff**